All right, our next case will be the Organization of Professional Aviculturists, Inc. v. United States Fish and Wildlife Service, and we'll wait just a moment to make sure we've got everybody with us for that case. All right. Okay, so again, I'll announce it. Organization of Professional Aviculturists, Inc. v. U.S. Fish and Wildlife Service will begin with Mr. Garcia. Good morning, Your Honors. David Anthony Garcia, on behalf of the appellants, the Organization of Professional Aviculturists, and the Linealated Parakeet Society. May it please the Court. The District Court erred in failing to hold unlawful and set aside the refusal of the U.S. Fish and Wildlife Service to consider the appellant's petition to list two societies-listed exotic bird species on the approved import list. The U.S. Fish and Wildlife refusal refused to consider the petitions because they sought to add species to the approved import list by country of origin from which they could be imported. These denials were procedural in nature and premised on an incorrect reading of the statute, and it is this procedural question that is before the Court. The appellant's position is simple. The plain and unambiguous language of 16 U.S.C. 4905a2 requires that a species be listed on the approved import list by country of origin from which it may be imported. This can only be done by a press. The appellant's reference to the collective nature of the term species, their attempts to raise substantive questions not at issue before the Court, arguments based on purpose, misleading references to legislative history, are not only wrong but are attempts to inject doubt to plain, unambiguous language. The District Court erred because it improperly understood the interpretive work that the phrase a species is doing in 4905a2. The plain language of 4905a2 can only be understood by reading the full sentence. The secretary shall list a species under paragraph one with respect to the countries of origin from which the species may be imported. Species is not an invisible object, as the District Court believes. At 16 U.S.C. 49037, species is defined as any species, subspecies, or distinct population segment of a species or subspecies. This is not the dictionary definition of species, but a definition that acknowledges that species can be. Let me ask you something. Was that an argument you made in your brief? Yes, Your Honor. In the brief, we made the argument that species is divisible. I thought you made the argument and I thought you conceded the meaning of species, and although you argued that it was divisible, you did not rely on the definition in the statute. It may or may not make a difference, except for purposes of fairness to your opponent. Yes, Your Honor. I do admit that we did not cite 49037, which is an error on our part, but that is the definition of species in the statute. Let me ask you something else about that, though. It talks about a distinct population segment, and we did a little research on what that means. It's not entirely clear what that means, except that Fish and Wildlife Service has previously referred to that distinct population segment in a different context. And in this different context, they said that, well, I'm going to have to find it for you and get back to you. It's not exactly what they said, but they said it was in a way that had to deal with if there's distinct ways of dealing with a species in the particular country or whatever it was. In other words, whether it was dealt with separately as an agricultural issue or whatever, in that separate way, it had a defined meaning in this other context. And I wonder if that other context is what governs here as well. Yes, Your Honor. DPS is how it's commonly referred to, and this is used in the ESA context and the Endangered Species Act context. And so it is a creation that is intended to consider populations that are important but don't rise to the level of subspecies in that ESA context. And everything in Chapter 16 of the US Code tends to refer to each other. And so I would argue that DPS here would probably mean the ESA definition. But if I may continue, I would say that even in 50 CFR 15.31, which is the implementing regulation, which is at issue here, also defines, talks about segments of species, so specimens of species, which is a distinct subset. So even in the implementing regulations at issue here, species is not a collective whole. Then that's how the agency treats it, as specimens of species. And furthermore, I would point to the fact that the statute as a whole talks about, has the obvious divisions between non-captive bred specimens and captive bred specimens of the species. So the idea that species is a collective noun or a collective whole, a collective object, doesn't really mesh with what the statute is doing, because it's acknowledging that species can be chopped up in multiple ways. So that's interesting, right? I mean, I think this presents an interesting question, because when you look at this, it also says, if you look at 4905A13B, it talks about considering the adequacy, it's one of the basis for determinations of whether to list the species, to consider the adequacy of the regulatory and enforcement mechanism in all countries of our species, including such mechanisms for controllability. But in other words, it's telling you to look at all countries of the origin for the species. And when you look at 4905 itself, the title is List of Approved Species. And while the title is, of course, not determinative, sometimes it can help us in understanding how to construe a section. It seems as though it's talking about listing species as a whole, and then under, you know, approving species as a whole, and then you would list them in addition to any, you know, after you've approved the species as a whole, you would list it by the countries of origin from which the species may be imported. Is that not right? Yes, so I don't disagree that it says all countries of origin for the species. I think that is something the agency has to consider. And obviously, your country of origins for a captive bred species could be many countries of origin, because country of origin includes places where a species is bred in captivity. So yes, the service has to consider all countries of origin. And as the government likes to refer to it as a global analysis, undoubtedly. But our counter is essentially that the manner of listing section says, list a species by country of origin from which the species may be imported, that which species may be imported is a substantive requirement. And so just because the agency needs to do a global analysis in certain aspects of the analysis that lead to a listing, that doesn't mean that the listing is to be that the listing is done when you list the species, you have to do the substantive consideration of which countries of origin we want to list them from. I'm sorry, maybe. So I'm trying to understand and maybe this is just more rudimentary. The provision that Judge Rosenbaum just cited speaks, I believe, to the bigger purpose of the statute, which is to conserve or protect exotic species of birds. And so that would explain why the agency has to do this global analysis to ensure that the bird species is not being proliferating or thriving in another corner of the world. If your interpretation prevailed, it sounds as if that scenario where you have birds endangered in one area, but not another would be okay and would still allow your clients to obtain the birds from these certain countries that they prefer, even though the birds globally are still in danger. Or am I misunderstanding something? Your Honor, I think, I don't want to say you're misunderstanding, but I think you're missing a factual issue. We are talking about captive bred birds. So to take one example of the two bird species that are at issue in the case, the cactus conure is endemic. It is only found in the wild in Brazil. Now we are asking to import, to be allowed to import the cactus conure only if it is bred in captivity in certain European countries, 6,000 miles outside of the native range, out of the range where this animal would be found in the wild. And so while yes, so our understanding of all countries of origin for the species, because country of origin is where the bird was bred in the wild, but also where it was born in captivity, would mean that the Fish and Wildlife Service has to look at the enforcement mechanisms in both Brazil and the European countries that we want to import it from. And they could still decide, they could always decide that the enforcement mechanisms in these European countries is insufficient to prove a listing. However, our position would be that our reading is more in line with the purpose of the statute, because if we want to import a bird only from Czech Republic, for example, that to address the laundering issues that the government raises in their briefs, that bird would have to be first taken from the wild, illegally exported to Europe, repapered as captive bred, issued a new CITES permit, exported from Czech Republic or from Europe, and then re-imported to the United States before it landed. And so in that scenario, it has to pass through the CITES authorities of at least three nations, and so is verified at least three times. The government would want us to list it worldwide, which would create the risk of saying, well, okay, we're going to give it to you, but you can import it from Brazil, where they're actually wild, and so it would be much easier to just take a bird and falsify that it was captive bred, or even cross it to an adjacent country, such as Venezuela or Suriname, where the CITES authorities are notably weak, and it would be possible for them to repaper it as captive bred and then import it to the United States. So I do think you have to consider all countries of origin, that is undoubtedly in the statute, but I think our reading provides a outcome that is more in favor with the statute, because I think the risk, the detrimental risk to the population is much greater if we list it as approved for import worldwide, every country in the world, or Brazil, than it is to say we only want to be allowed to import them if they have been bred, if they have been bred in captivity, if they are the product of sexual reproduction in captivity in a country that is 6,000 miles away from its endemic range, beyond an ocean, multiple trade borders, multiple international borders, and the last point I would add to this is that there is a financial aspect to this, which we're talking about a bird that is only worth a couple hundred dollars, so it is the profit that someone laundering an animal might have in Brazil as captive bred is much greater than if it had to be, than it had to do that path I just told you, Brazil, Europe, back to the U.S. There is no profit in that laundering scheme, and so if, when the service makes their determinations, our reading is much more in line with the purpose of that. All right, thank you. We'll hear from Ms. Ceballos. Good morning. May it please the court, Ostrich Jute Ceballos on behalf of the U.S. Fish and Wildlife Service. The Wild Exotic Bird Conservation Act bans imports of exotic birds of species listed in independent societies. This case is about a narrow exception to the Act's The Act authorizes the service to add captive bred species of birds to an approved list of species that can be imported into the United States if the service determines that the species is regularly bred in captivity and that no birds of the species caught in the wild are in trade. This determination helps prevent the potential laundering of birds caught in the wild as birds bred in captivity. As plaintiffs just explained, they petitioned the service to add but because the plain language of the WBCA doesn't authorize the service to add captive bred species to the approved list on a country-by-country basis, the service determined that the plaintiff's petitions were invalid. This reading of the statutory text, which is clear, is supported by the purpose and legislative history of the Act and is memorialized in the service's contemporaneous regulations and consistent interpretation over the past 30 years. And I want to mention also that plaintiffs are not without recourse here. Plaintiffs could use other exemptions that Congress created and that are available under the Act to import captive bred specimens of species that don't meet the requirements to be included on the list on a species-wide basis. I'd like to touch on three points. So first, I want to look at the statute and the provisions creating the approved list and that lay out the determination to add captive-bred species to that list. Okay, so their argument, as I understand it, seems like it's primarily based on 4905-2A. It says, the secretary shall list a species under paragraph one with respect to the countries of origin from which the species may be imported. And so the question is, and so they're saying that what that means is that you can, that you're required to list a species by the countries, that you have to list for each species that can, for which the exception applies, the countries of origin from which the species may be imported. And so that's why their petition should be approved. Why isn't that right? So if you look at the statute, starting, so I want to mention that 4909-C creates the moratorium and 4905, the provision you just pointed to, in A-1 creates this list, a list of species of exotic birds that are exempt from this prohibition. And A-2, the provision that you just mentioned and that plaintiffs focus on, describes the manner of listing species and putting them on that list. So it, what it does is it's, it's sort of a publication requirement. So once the species, once the secretary has made a determination under 4905-B or 4905-C that a species can be included on the list, then this is how the secretary writes the list. The secretary writes the species. Right. So it's a two-step thing. Correct. We identify the species as a whole. Second step, we figure out how we're going to list the species. That's right. Yeah. So, so the, the part that plaintiffs ignore here is, is section 4905-B-1, the determination that the service has to make to include a species of exotic birds in the list. And that's, that has two parts. The species is regularly bred in captivity, and no wild-caught birds of the species are in trade. And that, that is, that is very clear. That, that is the determination it has, determination that the service has to make to add a species to the list. And then you, you know, when you're looking at how to write up the list, you go to A-2 and you list the species with respect to, with respect to the countries of doesn't contain, doesn't tell us what substantive determination the service has to make to include a species on the list. It's just about how the list is published. So the point is, it would not be possible to, to determine that the species is regularly bred in captivity and no wild-caught birds of the species are in trade. With respect to, if you're just looking at a sub-universe of the species is common. Is that what your point is? That's correct. And, and, you know, I, in plaintiff's portion of the discussion, you touched on, there was some discussion about distinct population segments. And as, as we said on page 43 of our brief, we cited the definition of species that's in the WBCA at 49037, that does contain distinct population segment, but at no point in the petition or otherwise have plaintiffs argued that they were trying to add a distinct population, get a distinct population segment recognized as a species and added to the list. And distinct population segment, as you, as you noted is described under the ESA, there, there is a DPS policy that lays out determinations that the services have to make to figure out whether something qualifies as a distinct population segment. But I don't think that needs to be addressed here because plaintiffs have, have not raised that at any point in the briefing or in their petitions that, that this amalgamation of certain countries is a distinct population segment. Yeah. So two questions about that. The first one is I realized they didn't raise it, but we also want to make sure we get this right. We are interpreting a statute. There is a definitional section of that statute. I think we'd be happy to allow you to submit additional briefing on the issue if you wish to do so, since it was not raised in the briefing previously. Sorry, it took me a while to find the definition, but I have it in front of me now. That's the definition that says international boundaries may be considered in defining a distinct population segment when a country's borders quote coincide with differences in management status or exploitation of the species, right? I'm sorry, where, where are you? Where is that language? That's a definition that it actually comes from something that it's not in the statute and is for something completely unrelated. But when I was discussing it with opposing counsel, counsel seemed to think that was a sort of term of art. I don't know whether it is or isn't. I think we need you to weigh in on that as well. But, you know, this is the problem when it hasn't been briefed. But still, it's an issue that, you know, we want to make sure we get it right. And there is a definitional section of this statute. So I think we do need to consider how it affects the analysis. And I think his point was, well, it doesn't necessarily matter exactly what it means, because the point is, that that FWS can consider when it's talking about list of approved species, it could actually be talking about a smaller universe than the whole species. Right. So so yeah, species can be a distinct population segment of a species. And again, plaintiff's petitions did not argue that it was seeking to that plaintiffs were seeking to add a distinct population segment to the approved list. Yeah, it might not affect the decision on the petition for exactly that reason. But when we're construing the the statute itself, because one of the arguments they do make is they say they don't rely on that definition. But they say that it could be part of the species, right. And so they are kind of making a version of that argument, even if they're not citing the definition. So I think we might still have to contend with it. Sure. So so two things. The first, the first thing I'll say is, you know, is a species, even if the plaintiffs could list a distinct population segment, that is not the same as listing a species on a country by country basis, which is what what plaintiffs have sought to do, right? The distinct population segment inquiry, and if the court would like supplemental briefing on this, I'm happy to provide that. But the services, the Fish and Wildlife Service and the and the National Marine Fisheries Service have promulgated a they have a policy about how to determine whether something is a DPS, a distinct population segment under the ESA. And I have to confirm with the service, but I assume that the inquiry would be would be the same under under the WBCA. There isn't a different DPS policy that I'm aware of for the WBCA. And that policy is found at 61 Federal Register 4722. It's from 1996. And there are three elements to determine if something is a DPS, whether they can classify this this entity as DPS. One is the discreteness of the population segment in relation to the remainder of the species to which it belongs. And the second point, a component is the significance of the population segment to the species in which it belongs. So so that's, it has to be discrete, and it has to be significant or somehow important to the the species. And the third point is, you know, they look at the status in relation to the listing requirements in the ESA. And I think that that part would probably be different here. But But anyway, the main point is that the service would likely be looking at the discreteness and the significance. And so they were, again, that's that's not the same as listing species country by country saying, here are, you know, a list of countries that are not connected by any borders, right, where we think these species, this species exists. And, you know, to be honest, again, I'd have to consult with the service about this and maybe submit supplemental briefing. But I think it would be very difficult to argue that there is a distinct population of a captive bred species because the criteria sort of contemplate a species existing in the wild, right? It's a it's a population segment of a species that is somehow discrete, maybe it's a little isolated, and it's significant, maybe if, and that means maybe if it if it were to become extinct, then it would make the rest of the species endangered or something like that. So anyway, it's hard to contemplate how those criteria about a distinct population segment would apply in the context of captive bred species in the first place. But again, because this wasn't brief, this is a little bit off the cuff. Well, I appreciate that. I think, you know, I think maybe what we should do is, is give both parties 14 days to brief how if at all the the subspecies or the, I guess, see what we call it distinct population segment, the distinct population segment definition within species affects the analysis. And that way, you know, just be sure we've exhausted the entire statutory context when we are construing the statute. So let's do that. And for both parties 14 days from today, please file a brief on how if at all that term distinct population segment within the species within the statute affects the analysis here, if at all. Sure. Thank you. But you can continue. Yeah, if there are no further questions on that, I just want to make a make a few of my points. So I think we discussed it's clear that the moratorium, the provision creating the approved list, this determination in section 405 B1 that the service has to make to add captive species to the list talks about species. It doesn't. These provisions don't allow the service to either make country specific determinations or add species to the list on a country by country basis. And just to point out two parts of the statute that that do show that Congress knew how to ask, how to ask the service to make country specific determinations, we can look at 4905 B2 and 4905 C. So the species that is for, I'm sorry, maybe given the time, start with 4905 C for non-captive bred species. So species caught in the wild. If you look at C1, the secretary has to determine that the CITES is being effectively implemented with respect to that species because each country of origin for which the species is listed is effectively implementing the convention. So there it's very clear that the secretary has to consider country specific information and make determination that this species can be imported from this particular country. There is nothing like that in 4905 B1. It talks about species being regularly bred in captivity and there are no wild copyrights of the species in trade. There is no, it's not circumscribed by country at all. I know you mentioned this in your brief, but the other interesting thing of course is that 4904 C, it doesn't mention 4905 B, it mentions 4905 C. And I wonder if you want to just briefly address that. Yeah, I don't think that's particularly significant because 4904 C also refers to the species in the list published under section 4905 A of this title. So I think it clearly refers to the exemption created by the approved list, even if it's not explicitly referencing the exemptions for non captive bred, or I'm sorry, for captive bred species under 4905 B. I think, you know, this just highlights that Congress's main concern here was how trade in these species would impact wild bird populations. And, you know, Congress created this broad moratorium and also created very narrow exemptions or exceptions from that moratorium. And, you know, plaintiffs' argument would read in an exception that Congress didn't intend. You know, if Congress wanted the service to make determinations that captive bred species could be added to the list on a country by country basis, it would have said so. But it didn't. And I'm running out of time, so I don't want to take too much of your time. But I did want to note, plaintiffs are not without recourse. There are other exemptions under the Act, particularly under 4911, that plaintiffs could take advantage of to import captive bred specimens of species that don't meet the requirements to be included on the approved list. And, you know, Congress created a prophylactic measure here and plaintiffs' ideas. It doesn't really matter how unlikely plaintiffs seem to think it is that species could be wandered across borders. But Congress created the scheme that it wanted the service to implement. And we have to follow the statutory text here, which is clear. For all of these reasons, the service correctly determined that plaintiffs' petitions were invalid and this court should defer to the holding below. Thank you. Thank you. Mr. Garcia, you deserve some time. Yes, Your Honor. So briefly, I want to address one point that you made, which is if you grant this case on behalf of the appellants, that does not require the service to grant our petition. They did not hear our petition. They denied it summarily as an improper petition. So what we're asking for is to be heard and to get a decision on the merits, not for you to grant our petition. But that would be the first thing I'd want to clarify. Secondly, the government says that we ignore B1, 4905A, B1. We don't ignore it. We just don't think it does the interpretive work that the government seems to think it does. First off, it has two prongs. Species is regularly bred in captivity. There is no requirement that be a global analysis of the species. It just says regularly bred in captivity. So for example, a species that is only bred but in massive numbers in one country would arguably meet the definition of regularly bred in captivity. There's no requirement that we have to look at every country in the world to determine that it's being regularly bred in all 183 signatories to the convention. It just needs to be regularly bred in captivity. How the service determines that is neither defined here nor in the regulations. But the plain language does not require a global analysis of all 183 countries. The second prong is that no wild-caught birds are allowed to speak about trade. Trade is also defined in 50 CFR 23.5 as international. Sorry, sorry. It's okay. You said that it doesn't necessarily require a global analysis. We're talking about one. The first prong. Right. I guess it seems to me like it does require a global analysis. I mean, the secretary shall include a species of exotic birds, right? So we know what a species is, right? And the secretary and the species is regularly bred in captivity and no wild-caught of the species are in trade. Why doesn't that require a global consideration? So your honor, I was saying the first prong regularly bred in captivity does not require a global determination because a species could be regularly bred in one country of origin. Many species are currently in captivity and are not being bred in sub-Saharan Africa, in Kazakhstan, on Vanuatu. But it doesn't say the species is regularly bred in captivity in some places. I mean, it says the species, it's making, the secretary has to include a species of exotic birds. If it determines that the species is regularly bred in captivity, I mean, it seems like you have to consider the entire species, right? Why wouldn't you consider the entire species? And that necessarily includes globally. Yes, your honor. You're considering the entire species, yes. But no species of any animal that is non-domesticated is currently being regularly bred in captivity in every nation in the world, including the ones that are- Of course, of course, that's the case. But why wouldn't you consider, when you're talking about whether it's regularly bred in captivity, why wouldn't you consider the entirety of places where the species is present? Not necessarily that it's regularly bred in captivity in every single country, but you consider where in the entire world it is regularly captive and bred. Why wouldn't you do that? And you could do that. You could do that. The service could require that, but this language doesn't compel that requirement. For if you could give the example- How would that analysis be conducted? I mean, now you're picking and choosing which countries you want to examine, and the examples you gave perhaps undermine your point, which is that you're identifying places in the world where that is not an issue. That is still a global analysis. Yes, Your Honor. But to find that something is regularly bred in captivity, you can make that finding by looking at one nation that has a significant breeding facility. South Africa is one of the largest breeders of exotic birds in the world, and they regularly breed in captivity many species, but that are not regularly bred in captivity in other nations. So there's nothing in this language that says you could not look at one nation breeding large amounts of a species and say, we have found that it is regularly bred in captivity. What is the monetary difference in terms of importers between your position and the wildlife position and the government's position? I'm sorry, Your Honor, I couldn't hear you. What's the difference? What is the monetary difference, profit or whatever you want to call it, of your position versus the government's position? Your Honor, if we are allowed to commercially import this species, the profit is very small on this. If we were allowed to bring it in from Europe, the margin would be a couple hundred dollars. What you're saying is money doesn't matter at all? There is little financial incentive to launder these birds, because the value of these birds ultimately landed is in the hundreds of dollars. Well, I'll put it this way. Does it matter whether they're listed by country? Yes, it does. How does that translate into money? So, Your Honor, if the countries that are being asked for these birds to be listed from Europe, they are more expensive in Europe than they would be if they were imported out of Brazil. Out of Brazil, they are worth $20. But the appellants want captive-bred birds out of European countries with pedigrees that have been bred in captivity for long generations, to which there's no doubt that they are legally acquired. And those birds come at a premium, which is a couple hundred dollars. And so the birds we want are the more expensive birds. You'd rather have birds out of Europe than you would out of someplace else? Yes, without a doubt, without a doubt. We want high-quality birds out of Europe. And the problem is, without listing countries, the birds come from somewhere else. Yes, yes. If we were to meet the government's burden, which we don't necessarily say that we can, we wouldn't want that outcome regardless. We do not want birds to be allowed to be imported from Brazil. It is the position of the appellants that we would only want the birds out of Europe. We would want the market to be closed to South American imports, which are lower value, lower quality, and more likely to be illegal, have a greater risk of illegality. The appellants want the more restrictive position in this case, which is we want the U.S. market to only be allowed to import high-quality animals out of the European Union. Right now, you can't import any of them, right? No, Your Honor. For 32 years, nothing has been, only a few select species that were put on the list in 1994 were allowed to be imported. The Fish and Wildlife Service was supposed to conduct a periodic review of the list and add additional species. As the evidence of captive breeding increased worldwide, they have never done so. And this is one of the reasons. But the point is, it's not a situation right now. And that may or may not be right as far as what the law requires. I'm not opining on that. But the point is, just for purposes of getting our facts straight here, it's not a situation currently where birds are being illegally imported from the U.S.